UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 04-20225-CIV-SEITZ/MCALILEY

MOSHE SAPERSTEIN, et. al.,

    Plaintiffs,

v.

THE PALESTINIAN AUTHORITY, THE
PALESTINE LIBERATION ORGANIZATION, et. al.,

    Defendants.
_____/

## ORDER GRANTING MOTION TO DISMISS THE SECOND AND THIRD COUNTS OF THE THIRD AMENDED COMPLAINT

THIS CAUSE is before the Court on the motion of Defendants the Palestinian Authority ("PA") and the Palestine Liberation Organization ("PLO") to dismiss the Second and Third Counts of the Third Amended Complaint ("Motion to Dismiss") [DE 71].[1] In their Motion to Dismiss, Defendants argue that Counts 2 and 3 of Plaintiffs' Third Amended Complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1) because 28 U.S.C. § 1350 does not confer subject matter jurisdiction.[2] Upon review of the motion, the response and the reply thereto, and all relevant portions of the record, the Defendants' Motion to Dismiss is granted because the Court lacks subject matter jurisdiction over the claims in these two counts.

---

[1] Plaintiffs voluntarily dismissed all other defendants, namely, the Palestinian Preventive Security Services, the Estate of Yasser Arafat, Mahmoud Abbas, Yaser Mahmud Alkativ, Nizhard D'Hlis and Naim Mutzran (the "Individual Defendants") on December 13, 2006. (DE 82, 93.)

[2] 28 U.S.C. § 1350 is also referred to as the "Alien Tort Statute" ("ATS") or the Alien Tort Claims Act ("ATCA"). The provision states that "the district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." For purposes of this Order, it shall be referred to as the "ATS".

I.      BACKGROUND

A.      Procedural History

The events prior to the filing of the Third Amended Complaint ("TAC") are helpful to put Defendants' motion into context.  Plaintiffs commenced this action on January 29, 2004, and shortly thereafter filed a an Amended Complaint and then a Second Amended Complaint ("SAC").  (DE 1-2, 8.) Defendants then moved to dismiss the SAC for lack of subject matter jurisdiction, lack of personal jurisdiction and insufficiency of process and service of process.  (DE 14).  Unfortunately for Defendants, however, the Court struck the motion to dismiss because Defendants' attorneys Ramsey Clark and Lawrence Schilling were not members of The Florida Bar and had not been admitted *pro hac vice*.  (DE 21.)

In April 2005, Plaintiffs obtained a clerk's default against all Defendants and then moved for default judgment.  (DE 37-39.)  Prior to ruling on the default judgment motion, the Court granted Defendants motion for a special limited appearance to allow Mr. Clark and Mr. Schilling to appear in this case. (DE 46.)  With their counsel now appropriately admitted, Defendants moved to set aside the default and simultaneously opposed Plaintiffs motion for default judgment.  (DE 47.)  The Court, however, denied Defendants' motion to set aside the default because Defendants conduct "evinced an intentional disregard" for the proceedings.  (DE 51.)  The Court also denied Plaintiffs' motion for default judgment without prejudice with instructions that a renewed motion should address whether the Court has personal jurisdiction over the Defendants.  (*Id.*)  Plaintiffs filed a renewed motion for default judgment.  (DE 57.)  The Court granted the motion as to Count 1 (Plaintiff Saperstein's FTA claim), denied it with prejudice as to Count 2 (Plaintiff Saperstein's ATS claim) and denied it without prejudice as to Count 3  (Amergi Plaintiffs' ATS claim).  (DE 61.)

Thereafter, on August 11, 2006, Plaintiffs filed the operative TAC which Defendants moved to dismiss arguing, inter alia, (1) lack of subject matter jurisdiction, (2) lack of personal jurisdiction, (3) improper venue, (4) insufficiency of process, (5) insufficiency of service of process, and (6) failure to state a claim upon which relief can be granted (DE 68, 71).  The Defendants' motion to dismiss responded to the allegations of the Amergi Plaintiffs (Counts 2 and 3), but did not respond to the Saperstein Plaintiffs' claims (Count 1).[3]

### B.     The Allegations of the Third Amended Complaint

The allegations in the TAC, accepted as true for purposes of this motion to dismiss, are as follows.  Defendant PA is in de jure and de facto control of territories in the Gaza Strip and in the Judea and Samaria regions of the West Bank. (Complaint ¶ 1.)  Defendant PLO is in de jure and de facto control of Defendant PA.  (Id. ¶ 2.)  Dismissed Defendant Alkativ was a commander of the Palestinian General Intelligence Services and of the Al Aksa Brigades in Rafiach, an official law enforcement agency of the PA responsible for maintaining public order and prevention of violence and terrorism in the territories controlled by the PA and PLO.  (Id. ¶ 4.)  Alkativ also acted as purchasing agent of armaments for the PA and PLO and such armaments were used by young Palestinian operatives for acts of terror against Israel and its inhabitants.  (Id. ¶ 4.)

---

[3] As noted, Plaintiff Saperstein was granted default judgment as to Count 1 of the SAC.  (DE 61.)  In the TAC, however, Plaintiffs amended Count 1 to assert claims on behalf of Mr. Saperstein and his wife and children.  These Plaintiffs were not, however, given leave to make such amendment.  Further, the text of the FTA (18 USC § 2333) states: "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, *or* his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees." (Emphasis added.)  Thus, the statute is phrased disjunctively indicating that *either* Plaintiff Moshe Saperstein *or* his estate, survivors, or heirs may sue ...."  Because Mr. Saperstein was not mortally wounded, "his estate, survivors, or heirs" are not able to bring such action.  *Morris v. Khadr*, 415 F. Supp. 2d 1323, 1337-38 (D. Utah 2006) (finding that an individual's survivors or heirs cannot recover for a non-mortal injury.)  Thus, because Plaintiffs were not given leave to bring their FTA claim on behalf of all Saperstein Plaintiffs and because the FTA only allows the injured person *or* his estate, survivors or heirs to bring this cause of action, the claims of Mr. Saperstein's wife and children must be dismissed.

The PA and PLO advocated, encouraged, solicited, facilitated, incited, sponsored, organized, planned and executed acts of violence and terrorism against Jewish civilians in Israel, Gaza and the Judea and Samaria regions of the West Bank. (*Id.* ¶ 6.) The United States and Israel repeatedly demanded that the PA and PLO take effective measures to prevent further terrorist attacks. (*Id.* ¶ 7.) In violation of their undertakings and obligations under the Oslo Accords and under international customary law and local law, the PA and PLO refused and ignored American and Israeli demands to take effective measures to prevent further terrorist attacks. (*Id.* ¶ 8.)

Defendants PA and PLO granted financial support to the families of members of the Al Aksa Brigade who had been captured or killed while carrying out acts of terrorist violence against Jewish civilians in Israel, Gaza and the Judea and Samaria regions of the West Bank, thereby providing the Al Aksa Brigades and its members with strong financial incentive to continue to carry out the violence and terrorism against such victims. (*Id.* ¶ 9.) Defendants PA and PLO, through their respective agents continuously advocated, encouraged, solicited, facilitated and incited the use of violence and terrorism against Jewish civilians in Israel, Gaza and the Judea and Samaria regions of the West Bank. (*Id.* ¶ 11.)

Dismissed Defendant D'hliz was a convicted terrorist and member of the Al Aksa Brigades who purchased armaments for the PA and PLO under the orders of Alkativ. (*Id.* ¶ 12.) In early February 2002, Alkativ informed D'hliz that he recruited a young man, Katzir, and requested that D'hliz train Katzir as a terrorist on behalf of the PA and PLO. (*Id.* ¶ 13.) D'hliz trained Katzir in the operation of the AK-47 and techniques to disable passing vehicles and the execution of the vehicles' occupants, and after completing his training, Katzir became a member of the Al Aksa Brigades. (*Id.* ¶ 15.) Katzir executed his last will and testament and made a video statement regarding the acts of

terror he was to commit.  (*Id.* ¶ 17-18.)  Dismissed Defendant Mutzran is a convicted terrorist and a member of the Al Aksa Brigades whom Alkativ recruited.  (*Id.* ¶ 17.)

On February 18, 2002, Mutzran drove Katzir to the Netzarim Road in Gaza near Kisufim, Israel.  (*Id.* ¶ 20.)  At that time and place, Ahuva Amergi, an Israeli citizen and lawyer, was driving home from Ashkelon, Israel.  (*Id.* ¶ 36.)  Katzir performed the terrorist act that murdered Amergi when he sprayed her car with bullets from an AK-47.  (*Id.* ¶ 21, 36.)  Two Israeli soldiers heard the shots and came to the aid of Amergi, but were killed while attempting to protect her.  (*Id.* ¶ 37.)  Immediately thereafter, and further up the road, an Israeli battalion located and exchanged fire with Katzir.  (*Id.* ¶ 22.)  Katzir died either from his own hand grenade or an explosive device strapped to his body which prematurely detonated.  (*Id.*)

## II.    STANDARD OF REVIEW

A court will not grant a motion to dismiss unless the plaintiff fails to allege any facts that would entitle the plaintiff to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46, (1957). When ruling on a motion to dismiss, a court must view the complaint in the light most favorable to the plaintiff and accept the plaintiff's well-pleaded facts as true. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *St. Joseph's Hosp., Inc. v. Hosp. Corp. of Am.*, 795 F.2d 948, 953 (11th Cir. 1986).

A defendant may move to dismiss a complaint if it fails to allege facts sufficient to invoke the court's subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1). The party invoking jurisdiction bears the burden of producing the necessary facts to establish subject matter jurisdiction. *Taylor v. Appleton*, 30 F.3d 1365, 1367 (11th Cir. 1994).

### III. ANALYSIS

In their Motion to Dismiss, Defendants PA and PLO argue, *inter alia*,[4] that this Court does not have subject matter jurisdiction over the Amergi Plaintiffs' claims in Counts 2 and 3 of the TAC. With reference to Count 2, Defendants contend that the ATS does not grant the Court subject matter jurisdiction over claims based upon "private action" i.e., acts committed by a private actor. Defendants further argue that because there is no subject matter jurisdiction over Count 2, there can be no pendant jurisdiction over the Amergi Plaintiffs' common law claims in Count 3 for wrongful death. Plaintiffs' response acknowledges that the PA and PLO are private actors. While Plaintiffs concede that there is no state action, they contend that the ATS encompasses some types of "private (non-state) conduct and it is comfortably within that traditional zone of internationally proscribed conduct that the Amergi's claims lie." (Plaintiffs' Response at 2.)

Thus, the issues for determination are whether the ATS provides subject matter jurisdiction over claims based on the non-state, private action of the PA and PLO, and, if so, do the claims as described in the TAC constitute violations of the laws of nations. The answer to these questions necessitates a journey into the history and interpretation of the enigmatic Alien Tort Statute.

### A. The Alien Tort Statute

The ATS provides: "the district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. The Eleventh Circuit has recognized that the ATS "establishes a federal forum where courts may fashion domestic common law remedies to give effect to violations of customary

---

[4] Because the Court lacks subject matter jurisdiction, it is not necessary to analyze Defendants other arguments, which include lack of personal jurisdiction, improper venue, insufficiency of process, insufficiency of service of process and failure to state a claim upon which relief can be granted.

international law." *Abebe-Jira v. Negewo*, 72 F.3d 844, 848 (11th Cir. 1996), cert. denied, 519 U.S. 830 (1996). Thus, the ATS "creates both subject matter jurisdiction and a private right of action." *Estate of Winston Cabello v. Fernandez-Larios*, 157 F. Supp. 2d 1345 (S.D. Fla. 2001) (citing *Abebe-Jira*, 72 F.3d at 848)). Federal subject matter jurisdiction exists when: (1) an alien sues (2) for a tort (3) committed in violation of the law of nations. *Kadic v. Karadzic*, 70 F.3d 232, 238 (2d Cir. 1995).[5]

### The Law of Nations

Under the ATS, the "law of nations" refers to a body of law known as customary international law. *Flores v. Southern Peru Copper Corp.*, 343 F.3d 140, 154 (2d Cir. 2003). Conduct violates the "law of the nations" if it contravenes "well-established, universally recognized norms of international law." *Kadic,* 70 F.3d at 239.

The Congress first enacted the ATS as part of the Judiciary Act of 1789. The only "violation[s] of the law of nations" known at that time were "violation of safe conducts, infringement of the rights of ambassadors, and piracy." *Sosa v. Alvarez-Machain,* 542 U.S. 692, 725 (2004). Since 1789, new claims may be recognized under common law principles, but they must "rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th Century paradigms we have recognized." *Id.*

In *Sosa*, the Supreme Court admonished the lower federal courts to be extremely cautious about discovering new offenses among the law of nations. *Id*. at 728. The Court then discussed the five reasons underlying this cautionary restraint: 1) common law judges in the past were seen as "discovering law, but they are now seen as making or creating law; 2) since *Erie v. Tompkins*, 304 U.S.

---

[5] Plaintiffs have sufficiently alleged that they are aliens and suing for a tort, therefore the analysis focuses on the third prong, i.e., was the tort "committed in violation of the law of nations."

64 (1938), the role of federal common law has been dramatically reduced, and courts have generally looked for legislative guidance before taking innovative measures; 3) creating private rights of action is generally best left to the legislature; 4) decisions involving international law may have collateral consequences that impinge on the discretion of the legislative and executive branches in managing foreign affairs; and 5) there is no mandate from Congress encouraging judicial creativity in this area, and, in fact, there is legislative hints in the opposite direction. *See Sosa,* 542 U.S. at 725-728; *Ibrahaim v. Titan Corp.*, 391 F.Supp. 2d 10, 13-14 (D.D.C. 2005).

Defining customary international law is no simple feat; it is "discerned from myriad of decisions made in numerous and varied international and domestic arenas." *Flores*, 343 F.3d at 154. In *United States v. Smith*, 18 U.S. 153, 160-61 (1820), the Supreme Court counseled that the law of nations "may be ascertained by consulting the works of jurists, writing professedly on public law; or by the general usage and practice of nations; or by judicial decisions recognising [sic] and enforcing that law." Moreover, courts "must interpret international law not as it was in 1789, but as it has evolved and exists among the nations of the world today." *Kadic*, 70 F.3d at 238 (quoting *Filartiga v. Pena-Irala*, 630 F.2d 876, 881 (2d Cir. 1980)).

To resolve the instant motion, it is necessary to determine first if private actors can be held accountable for a violation of the law of nations. If not, it is not necessary to proceed further as the PA and PLO are private actors.[6] However, a finding that private actors can be held accountable for such violation, then requires a determination of whether the conduct alleged in the TAC constitutes a violation of the law of nations. These issues have been developed in the circuit courts over the past 20 years. Accordingly, a review of the relevant case law is helpful to the resolution of this motion.

---

[6] Plaintiffs concede that the PA and the PLO are not state actors for the purposes of the ATS. (Plaintiffs' Response at 2.)

### 1. The *Filartiga* Case

The leading case interpreting the Alien Tort Statute is *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir.1980). The *Filartiga* decision itself did not contemplate the obligations of a private actor, but it set up the framework for ascertaining violations of the law of nations. In 1979, Dolly Filartiga, who had immigrated to the United States, learned that Americo Norberto Pena-Irala, a former Paraguayan police official, was residing in Brooklyn, New York. *Id.* at 878-79. Thereafter, Filartiga and her father, Dr. Joel Filartiga, filed a wrongful death action in federal district court under the ATS, alleging that in 1976 Pena-Irala kidnaped and tortured to death Joelito Filartiga, Dr. Filartiga's seventeen-year-old son. The district court dismissed the Filartigas' complaint for lack of subject matter jurisdiction. The court of appeals reversed recognizing the emergence of a universal consensus that international law affords substantive rights to individuals and places limits on a state's treatment of its citizens.[7] *Id.* at 880-87. The Second Circuit emphasized that federal courts considering whether to assume jurisdiction under the ATS should interpret international law as it has evolved and exists at the time of the case. *Id.* at 881. The court then concluded that official torture is prohibited by the law of nations. *Id.* at 884.

While *Filartiga* provides guidance regarding how to interpret international law, because it involved "state action" as opposed to private action, it is not entirely dispositive of the instant matter. Therefore, it is necessary to examine the evolution and application of the *Filartiga* decision in more factually similar cases.

---

[7] *Filartiga* did not consider the alternative prong of the ATS: suits by aliens for a tort committed in violation of "a treaty of the United States." *See* 630 F.2d at 880. As in *Filartiga*, Plaintiffs in this case "primarily rely upon treaties and other international instruments as evidence of an emerging norm of customary independent sources of law." *Id.* at 880 n. 7.

### 2.     *Tel-Oren v. Libyan Arab Republic*

In *Tel Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C. Cir. 1984), cert. denied, 470 U.S. 1003 (1985), victims of a 1978 terrorist attack in Israel sued a number of parties, including several private organizations, for violations of the law of nations under the ATS. The terrorists seized a civilian bus, a taxi, a passing car, and subsequently a second civilian bus and took the passengers hostage. *Id.* at 776. The terrorists tortured, shot, wounded and murdered many of the hostages. *Id.* A three-judge panel unanimously dismissed the case with three separate opinions. Judge Edwards gave the ATS the broadest reach, generally agreeing with the decision in *Filartiga* that acts of official torture violate the law of nations. *Id.* at 791. Judge Edwards, however, found no consensus that private actors are bound by the law of nations with regard to torture.[8] *Id.* at 791-95. Only a year later, the court of appeals addressed the issue again in *Sanchez-Espinoza v. Reagan*, 770 F.2d 202 (D.C. Cir. 1985), a case involving allegations of "execution, murder, abduction, torture, rape, [and] wounding" by the Nicaraguan Contras. In *Sanchez-Espinoza*, the appellate court stated quite clearly that the law of nations "does not reach private, non-state conduct of this sort" for the reasons stated by Judge Edwards and Judge Bork in *Tel-Oren*. *Id.* at 205-207.

In *Tel Oren*, Judge Edwards undertook an in-depth analysis of whether to stretch *Filartiga's* reasoning to incorporate torture perpetuated by a party other than a recognized state or one of its officials. *Tel Oren,* 726 F.2d at 792-95. Judge Edwards observed that the extension would necessarily require the court to venture out of the realm of established international law in which states are the actors and would mandate an assessment of the extent to which international law imposes not only

---

[8] Judge Edwards acknowledged that piracy and slave trading were areas in which individual liability was imposed. *Tel Oren*, 726 F.2d at 794.

rights but also obligations on individuals.[9] *Id.* at 792. He concluded his analysis saying that he "was not prepared to extend the definition of the 'law of nations' absent direction from the Supreme Court." *Id.*

Judge Edwards also examined the question of whether terrorism in and of itself was a law of nations violation, regardless of whether it is conducted by a state or private actor. *Id.* at 795-96. In finding that condemnation of terrorism was not universal, he stated that "the nations of the world are so divisively split on the legitimacy of such aggression as to make it impossible to pinpoint an area of harmony or consensus."[10] *Id.* Thus, he concluded that the law of nations, defined as the principles and rules that states feel themselves bound to observe, did not outlaw politically motivated terrorism. *Id.*

### 3. *Kadic v. Karadzic*

The 1995 *Kadic v. Karadzic* decision is the most recent circuit court opinion thoroughly analyzing those actions for which international law imposes individual liability. 70 F.3d 232 (2nd Cir. 1995). In *Kadic*, the plaintiffs, Croat and Muslim citizens of Bosnia-Herzegovina, sued the president of the self-proclaimed Bosnian-Serb republic within Bosnia Herzegovina. 70 F.3d at 237. Plaintiffs asserted causes of action for various atrocities at the hands of the Bosnian-Serb republic including,

---

[9] Judge Edwards highlighted some of the ramifications of extending the *Filartiga* reasoning to the actions of private entities, stating: "[i]t would require a determination of where to draw a line between persons or groups who are or are not bound by dictates of international law, and what the groups look like. Would the terrorists be liable, because numerous international documents recognize their existence and proscribe their acts?" He further asked, "would all organized political entities be obliged to abide by the law of nations? Would everybody be liable? As firmly established as is the core principle binding states to customary international obligations, these fringe areas are only gradually emerging and offer, as of now, no obvious stopping point." *Tel Oren*, 726 F.2d 59.

[10] As support for the proposition that terrorism is not a violation of the law of nations, Judge Edwards referenced documents of the United Nations. He contends that they demonstrate that to some states acts of terrorism, in particular those with political motives, are legitimate acts of aggression and are therefore immune from condemnation. As an example, Judge Edwards points to a resolution entitled "Basic principles of the legal status of the combatants struggling against colonial and alien domination an racist regimes," G.A. Res. 3103, 28 U.N. GAOR at 512, U.N. Doc. A/9102 (1973), which declared, "The struggle of peoples under colonial and alien domination and racist regimes for the implementation of their right to self-determination and independence is legitimate and in full accordance with principles of international law."

genocide, rape, forced prostitution and impregnation, torture, and other cruel, inhuman and degrading treatment such as assault and battery, sex and ethnic inequality, summary execution and wrongful death. *Id.* The district court dismissed the case finding that defendant was not a state actor for purposes of the ATS but the court of appeals reversed. *Id.* at 239. In so doing, the Second Circuit found that the law of nations, as understood in the modern era, did not confine its reach to state action. *Id.* The court of appeals held that "certain forms of conduct violate the laws of nations whether undertaken by those acting under the auspices of a state or only as a private individuals, such as piracy, slave-trading, aircraft hijacking, genocide, and war crimes."[11] *Id.* at 240-43. The Second Circuit, however, held that torture and summary execution, when not perpetrated in the course of genocide or war crimes, are proscribed by international law only when committed by state officials under color of law. *Id.* at 243.

These cases reflect the trend toward finding that certain conduct violates the law of nations whether committed by a state or a private actor, however, which conduct falls into this realm has not been completely defined. Plaintiffs contend that a violation of the "law of war" now called "international humanitarian law" is recognized as a breach of the law of nations and the actions alleged in the TAC constitute such violations. (Plaintiffs' Response at 4-7.)

---

[11] The definition of genocide is taken "The Convention on the Prevention and Punishment of the Crime of Genocide, 78 U.N.T.S. 277, entered into force Jan. 12, 1951, for the United States Feb. 23, 1989. The definition of war crimes is taken from Common Article 3 included in four Geneva Conventions: (1) Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field, 75 U.N.T.S. 31, entered into force Oct. 21, 1950, for the United States Feb. 2, 1956 (hereinafter, Geneva Convention 1); (2) Convention for the Amelioration of the Condition of the Wounded, Sick, and Shipwrecked Members of the Armed Forces at Sea, 75 U.N.T.S. 85, entered into force Oct. 21, 1950, for the United States Feb. 2, 1956; (3) Convention Relative to the Treatment of Prisoners of War, 75 U.N.T.S. 135, entered into force Oct. 21, 1950, for the United States Feb. 2, 1956; and (4) Convention Relative to the Protection of Civilian Persons at Time of War, 75 U.N.T.S. 287, entered into force Oct. 21, 1950, for the United States Feb 2, 1956.

B.      **International Humanitarian Law**

After the Second World War, the law of war was codified in the four Geneva Conventions which have been ratified by more than 180 nations, including the United States. *See* U.S. Dept. of State, Treaties in Force 398-99 (2006). Common Article 3, which is substantially identical in each of the four Conventions applies to "armed conflicts not of an international character" and binds "each Party to the conflict ... to apply, as a minimum the following provisions:"

> Persons taking no active part in the hostilities ... shall in all circumstances be treated humanely, without any adverse distinction founded on race, colour, religion or faith, sex, birth or wealth, or any other similar criteria. To this end, the following acts are and shall remain prohibited at any time and in any place whatsoever with respect to the above mentioned persons: (a) violence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture; (b) taking of hostages; (c) outrages upon personal dignity, in particular humiliating and degrading treatment; (d) the passing of sentences and carrying out of executions without previous judgment pronounced by a regularly constituted court.

Geneva Convention 1 art. 3(1).[12] Plaintiffs cite *Hamdan v. Rumsfeld*, 126 S.Ct. 2749 (2006) in arguing that the acts alleged in the TAC indicate that the situation surrounding the death of Amergi constitutes an "armed conflict not of an international character" for the purposes of Common Article 3 and that the her murder is a violation of such provision, and therefore, such acts amount to a violation of the law of nations. (Plaintiffs' Response at 5-6.)

In *Hamdan,* the Supreme Court was presented with the question of whether the provisions of the various Geneva Conventions, specifically Common Article 3, applied to a combatant fighting for Al Quaeda, who was apprehended in Afghanistan. 126 S.Ct. at 2759. In finding that Common Article 3 did apply, the Supreme Court stated that the conflict between the U.S. and Al Quaeda in Afghanistan was a "conflict not of an international character" and that "the scope of the Article must be as wide as

---

[12] For convenience sake, only citations to Geneva Convention I are used. Full citations to the four Conventions are included in footnote 11.

possible." *Id.* at 2796.

With this legal landscape in mind and noting the Supreme Court's cautionary advice regarding the creation of new offenses in the law of nations in *Sosa*, the Court turns to the Plaintiffs' allegations.

**C.     Plaintiffs Fail to Plead a Violation of the Law of Nations Sufficient to Invoke the Court's Subject Matter Jurisdiction.**

To resolve Defendants' motion, it is necessary to determine if the Plaintiffs' TAC allegations fit the categories of conduct that prior courts have found constitute a violation of the law of nations, even when carried out by a private actor. The conduct in *Tel Oren* is substantially similar to the conduct in the present case. Judge Edwards, in *Tel Oren,* made it abundantly clear that politically motivated terrorism has not reached the status of a violation of the law of nations.[13] In their own words, Plaintiffs describe Defendants' conduct as terrorism.[14] Beginning with their introduction, Plaintiffs state that they bring this action for damages caused by Defendants' "acts of terrorism as defined in federal law, and by reason of related tortious terrorist behavior." (TAC at 2.) Further, Plaintiffs specifically allege that the PA and PLO failed to "denounce and condemn acts of terror, apprehend, prosecute and imprison persons involved directly, and/or indirectly in acts of terrorism and outlaw and dismantle the infrastructure of terrorist organizations. (*Id.* ¶ 67.)[15] Thus, if the conduct

---

[13] Judge Edwards' discussion of terrorism as it relates to the law of nations was in the context of state action rather than private action. *Tel Oren,* 726 F.2d at 795. Within the analytical framework developed in the cases discussed above, if state action does not violate the law of nations, then there is an even higher threshold to hold private action as a violation the law of nations.

[14] In fact, Plaintiffs used the words "terror, terrorism or terrorist" at least 20 times in their TAC in relation to Counts 2 and 3.

[15] Plaintiffs also make other assertions that characterize the Defendants' conduct as terrorism. Plaintiffs contend that the PA and PLO, through Alkativ, purchased armaments for use by Palestinian operatives "for acts of terror against Israel." (*Id.* ¶ 4.) Plaintiffs state that the PA and PLO advocated "acts of violence and terrorism against Jewish civilians." (*Id.* ¶ 6.) Plaintiffs assert that the governments of the United States and Israel repeatedly demanded that the PA and PLO "take effective measures to prevent further terrorist attacks" and the PA and PLO ignored such requests. (*Id.* ¶ 7-8.)

Further, Plaintiffs contend that the PA and PLO financially supported the families of those that had been

of the Defendants is construed as terrorism, then Plaintiffs have not alleged a violation of the law of nations.

Plaintiffs attempt to get around such facts in their response to Defendants' motion to dismiss by characterizing the allegations in the TAC as a "murder of [a] civilian[] in the course of an armed conflict," or a war crime.[16] (Plaintiffs' Response at 2.) In doing this, Plaintiffs are grasping at the *Kadic* decision and attempting to bring the alleged conduct within the language of Common Article 3. Plaintiffs' strategy in this regard is certainly obvious, as the Second Circuit in *Kadic* based much of its analysis of the definition of "war crimes" on Common Article 3. *Kadic*, 70 F.3d at 242-43. However, Plaintiffs then make the overreaching leap by stating that if the conduct falls within Common Article 3 and is prohibited thereby, then they have sufficiently alleged a violation of the law of nations for purposes of the ATS. Essentially, Plaintiffs are saying that if they allege a murder of an innocent person during an armed conflict, then they have alleged a per se violation of the law of nations and federal courts have subject matter jurisdiction over the dispute under the ATS. No court has so held. In fact, as discussed above, international customary law is not taken from one source but rather is "discerned from [a] myriad of decisions made in numerous and varied international and domestic arenas." *See Flores*, 343 F.3d at 154.

---

captured or killed "carrying out acts of terrorist violence against Jewish civilians" which provided an incentive to carry out "violence and terrorism against such victims." (*Id.* ¶ 9.) Plaintiffs also allege that the PA and PLO continuously advocated the "use of violence and terrorism against Jewish civilians Israel, Gaza and the Judea and Samaria regions of the West Bank." (*Id.* ¶ 11.) Plaintiffs allege that Alkativ informed D'hliz, "a convicted terrorist," that he recruited Katzir "as a terrorist" on behalf of the PA and PLO. (*Id.* ¶¶ 12-13.) Plaintiff also states that Mutzran was a "convicted terrorist" and that Katzir executed his last will and testament and made a video statement regarding the "acts of terror he was to commit." (*Id.* ¶ 17-18.) Finally, Plaintiffs alleged that "Katzir performed the terrorist act, which he had been trained for" and that Amergi was "murdered during the terrorist act." (*Id.* ¶ 21, 35.)

[16] Plaintiffs subsequent arguments make clear that they are now asserting that Defendants conduct constitutes a war crime. (Plaintiffs' Response at 4, discussing the law of war as codified in the four Geneva Conventions.)

Further, while Plaintiffs' reliance on the *Kadic* decision's references to Common Article 3 is understandable, the severe and horrendous conduct alleged in that case, including "brutal acts of rape, forced prostitution, forced impregnation, torture and summary execution" against an entire class of citizens, differentiate it from this case. Unlike the conduct alleged here, the abominate actions the Croat and Muslim plaintiffs asserted in *Kadic* did not require the same extent of canvassing of international law to determine if the prohibition of such conduct was "universally recognized." Thus, the Second Circuit's reliance on Common Article 3 was sufficient to ascertain a consensus in customary international law. In fact, the appellate court specifically directed their decision to the particular horrendous allegations by stating that the "offenses alleged by the [plaintiffs], if proved, would violate the most fundamental norms of the law of war embodied in common article 3." *See Kadic*, 73 F.2d at 243. The court of appeals did not make a blanket holding that any alleged violation of Common Article 3 would be sufficient for the purposes of the ATS.

Further, two practical considerations highlight the flaws in Plaintiffs' desired expansion of the law of nations. First, if it were accepted that any alleged violation of Common Article 3 was sufficient for subject matter jurisdiction under the ATS, then a violation of any provision in the Article would yield the same result. This includes such unspecific conduct as "violence to life," "cruel treatment" and "outrages upon personal dignity." For federal courts to interpret such ambiguous standards to assess its own subject matter jurisdiction would pose problems for federal courts and would not meet the defined standards of specificity that *Sosa* requires. Second, if Plaintiffs' specific allegation, i.e., the murder of an innocent civilian during an armed conflict, was sufficient for the purposes of the ATS, then whenever an innocent person was murdered during an "armed conflict" anywhere in the world, whether it be Bosnia, the Middle East or Darfur, Sudan, the federal courts would have subject matter jurisdiction over the dispute. Clearly, such an interpretation would not only make district courts

international courts of civil justice, it would be in direct contravention of the Supreme Court's specific prudential guidance admonishing lower courts to be cautious in creating new offenses under the law of nations. *See Sosa*, 542 U.S. 725. For the foregoing reasons, Plaintiffs do not sufficiently allege a violation of the law of nations and, thus, this Court lacks subject matter jurisdiction.

### D. The Count 3 Common Law Claims for Wrongful Death

Having found that the Court does not have original jurisdiction under the ATS over Count 2, there is no basis to assert pendant jurisdiction over the common law claims in Count 3. Fed. R. Civ. P. § 1367 (a).

### IV. CONCLUSION

For the reasons set forth above, it is hereby

ORDERED that:

(1)   Defendants' Motion to Dismiss [DE 71] is GRANTED.

(2)   All claims against the Individual Defendants are DISMISSED WITH PREJUDICE.

(3)   The claims of the Saperstein Plaintiffs other than Moshe Saperstein are DISMISSED WITH PREJUDICE.

DONE AND ORDERED in Miami, Florida, this 22nd day of December, 2006.

PATRICIA A. SEITZ
UNITED STATES DISTRICT COURT

cc:   Counsel of Record