

**State of Israel vs Marwan Barghouti- Ruling by Judge Zvi Gurfinkel- Dec 12- 2002**
12 Dec 2002

## State of Israel vs. Marwan Barghouti: Ruling by Judge Zvi Gurfinkel

**District Court of Tel Aviv and Jaffa**
**Dec 12, 2002**

The Defendant, Marwan Barghouti, disputed the authority of the Court in Israel to try him. On December 12, 2002, Judge Zvi Gurfinkel issued the following ruling, in which he concludes:

*"I reject the argument at this stage of the proceeding regarding the Court's authority in the context of the petition for the detention pending completion of proceedings filed by the State against the Defendant.*

*Ultimately, the State of Israel has the right and the authority to judge the Defendant, as emerges from Israeli law, from the Oslo Accords and from the rules of international law.*

*Accordingly, the Court is empowered to discuss the Applicant's petition to detain the Defendant pending the completion of proceedings in his trial, and the petition shall be discussed in substance."*

**Following is the full text of the ruling:**

District Court of Tel Aviv and Jaffa
Criminal Case No. 092134 /02
Before: Judge Zvi Gorfinkel
Date: December 12, 2002

In the Matter of:

STATE OF ISRAEL
Represented by Attorney Chen
The Plaintiff

- Versus -

MARWAN BIN KHATIB BARGHOUTI
Represented by Attorneys Boulus, Anis and Leibowitz

The Defendant

**Ruling**

In the indictment filed against the Defendant, it is alleged that at the end of September 2000 or near that time, Palestinian elements caused the outbreak of violent incidents to which these elements refer as the "Al-Aqsa Intifada."

These violent incidents include ongoing and intensive terror activity against Israeli targets, including the execution of suicide attacks and murderous shooting attacks, as a result of which hundreds of civilians and soldiers of the State of Israel have lost their lives, and hundreds more have been wounded (hereinafter: "Acts of Terror").

Among the central Palestinian elements that were engaged in carrying out the Acts of Terror against Israel during the Relevant Period were:

**"Fatah"** (The Movement for the Liberation of Palestine) - An organization that has engraved upon its flag the principle of "armed struggle" - the liberation of "Palestine" through violent means. Fatah is a terrorist organization as defined in the Prevention of Terrorism Ordinance, 5708-1948 (hereinafter: "the Prevention of Terrorism Ordinance").

**The "Tanzim" -** an organizational framework through which the activity of the Fatah members was implemented in the Judea and Samaria region and in Gaza. In the Relevant Period for the Indictment, the organization has waged a violent and armed struggle while committing Acts of Terror against Israel, its civilians and its soldiers. The Tanzim is a terrorist organization as defined in the Prevention of Terrorism Ordinance.

**"The Al-Aqsa Martyrs Brigade" (Kataib Shuhada Al-Aqsa) -** cells of Tanzim terror activists who have committed Acts of Terror against Israeli targets, and during the Relevant Period for the Indictment began to use the name "Al-Aqsa Martyrs Brigade." They also took responsibility for the Acts of Terror they committed under this name. These cells are a terrorist organization as defined in the Prevention of Terrorism Ordinance.

The Defendant, who is a resident of Ramallah, is the head of the Terrorist Organizations in the Judea and Samaria area. He is their leader and was a central partner in their decision making.

The Defendant was subordinate to Yasser Arafat, who is head of the Terrorist Organizations.

During the Relevant Period for the Indictment, the Terrorist Organizations engaged in intensive Acts of Terror against Israeli targets, in accordance with the policy established by the leadership of the organizations.

The Defendant led, managed and operated Acts of Terror against Israeli targets by conspiring with senior field operatives, who were responsible for the actual implementation of the Acts of Terror, according to the aforesaid established policy, which the Defendant was engaged in implementing.

Senior and key terror activists with whom the Defendant conspired to commit the Acts of Terror under his leadership were, among others: Nasser Aweis, Ahmed Barghouti, Nasser Abu Hamid, Ra'ad Karmi, Muhaned Diria (Abu Halawa), Muhammad Musalah (Abu Satha), Mansour Shrim and Mahmoud Titi (hereinafter: "the Field Commanders"). Ahmed Barghouti (hereinafter: Ahmed) also served as the Defendant's right hand man and his liaison in contacts with the other Field Commanders.

The field commanders committed the Acts of Terror by conspiring with the field activists who were subordinated to them, were under their command and operated according to their orders (hereinafter: "Terror Activists").

Each time a decision was made by the leadership of the Terrorist Organizations to halt the Acts of Terror due to various constraints, political and otherwise, the Defendant instructed the Field Commanders and their subordinated activists to halt the Acts of Terror.

The end result of this pattern of activity was that during the Relevant Period for the Indictment, since no explicit order was given by the Defendant to halt the Acts of Terror, the Commanders and their subordinate Terror Activists continued to carry out

Acts of Terror in accordance with the policy of the leadership of the Terrorist Organizations throughout that entire period, as detailed above.

Within the conspiracy to commit Acts of Terror and with the intention of promoting this conspiracy, the Defendant and his subordinates carried out a series of actions that caused, promoted and enabled the implementation of the Acts of Terror.

The Defendant, who led, managed and operated the Acts of Terror, was aware of the activity of the Field Commanders and their subordinated Terror Activists, and was updated with regard to their activity, both directly and indirectly, as in the case of the attack on the Sea Food Market restaurant in Tel Aviv, to be detailed below.

At or about 02:30 on March 5, 2002, the terrorist Ibrahim Hasouna (hereinafter: "Hasouna") arrived at the "Sea Food Market" restaurant on Menachem Begin St. in Tel Aviv (hereinafter: "the Restaurant") armed with an M-16 rifle, grenades and a knife with the intention to commit a murderous attack.

At that same time, the Restaurant was completely packed with dozens of diners. Hasouna arrived at the "Maariv House Bridge" located on the aforementioned street opposite the Restaurant and began shooting at the diners with the intention of willfully causing the deaths of many of them. Near this time Hasouna threw hand grenades into the Restaurant that miraculously did not explode. Immediately thereafter Hasouna approached the Restaurant and stabbed those Restaurant diners who got in his way, with the goal of willfully causing the deaths of many of the diners.

Immediately after Hasouna began shooting at diners as described above, forces of the Israel Police were called to the area. One of the first police officers to arrive at the scene of the attack was the late Staff Sergeant-Major Selim Barakat, who charged at Hasouna with the purpose of stopping his murderous activities. Hasouna stabbed Staff Sergeant-Major Selim Barakat in various parts of his body and neck repeatedly, using a knife he was equipped with, with the intention of willfully causing his death.

In his actions as described above, Hasouna caused the intentional deaths of the late 33-year old Staff Sergeant-Major Selim Barakat, who died as a result of the fatal stabbings; the late 52-year old Yosef Habi, who died as a result of Hasouna's fatal stabbings in his chest and other parts of his body and was also hit by a bullet in his leg; and the late 53-year old Eliyahu Dahan, who met his death as a result of the Hasouna's fatal stabbings in his back and stomach.

Likewise, as a result of Hasouna's aforementioned acts, committed with the intention of causing serious bodily harm, dozens of other people were hurt, some of who suffered serious injuries.

Hasouna was shot to death by Israel's security forces upon their arrival at the scene of the attack.

Hasouna was recruited for the aforementioned attack shortly before March 5, 2002, by Nasser Aweis, who was one of the senior and central Field Commanders during the Relevant Period for the Indictment.

Aweis conspired together with Ahmed Barghouti, Mahmoud Titi and additional activists to carry out an attack with the purpose of willfully causing the death of many Israelis, and the Defendant was aware of this. In order to promote the conspiracy and implement it, the conspirators who joined together for the purpose of the conspiracy equipped Hasouna with a weapon, filmed him on videotape as a "suicide terrorist" and carried out all the logistical activity necessary for implementing the attack.

On the aforementioned date, near the time of the attack, Hasouna was led by activists who joined together for the conspiracy, to the location where the attack was carried out.

While Hasouna and the activists leading him were on their way to execute the attack, Ahmed notified the Defendant of this. The Defendant authorized the execution of the attack, but requested that it not be carried out within Israel but within boundaries of the Judea and Samaria area.

Shortly after the attack was carried out, at or about 3:00, Ahmed called the Defendant and reported to him that the attack was carried out as detailed above, and that this was being reported on television. The Defendant replied that he was watching television, and knew about the execution of the attack. The Defendant requested that Nasser Aweis consult with him before issuing the leaflet in which the Terrorist Organization takes responsibility for execution of the attack.

The Defendant and the Field Commanders engaged in recruiting activists for the Terrorist Organizations.

In addition, they operated, incited and encouraged the terror activists, including those who they recruited during the Relevant Period, to commit Acts of Terror. Moreover, they took care of all the logistical details necessary for the execution of these acts.

Within this activity, during the month of May 2001 or near that time, Ismail Radaida (hereinafter: "Ismail") approached the defendant and requested to be recruited for terror activity, with the purpose of committing a suicide attack. At the same occasion, the Defendant told him that he was willing to provide him with weaponry for the execution of shooting attacks against soldiers and settlers. Immediately afterwards, the Defendant referred Ismail to Muhaned Abu Halawa, who was one of the Field Commanders, as mentioned above. He did so knowing that the latter was in charge of a cell of activists that was carrying out attacks against Israeli targets.

The following day, Muhaned Abu Halawa gave Ismail two AK-47 rifles with magazines filled with bullets and a bag with additional bullets.

On June 12, 2001, Ismail, together with another activist, laid an ambush for cars traveling on the road leading from Jerusalem to Ma'aleh Adumim. At or about 22:40, Ismail fired a volley of approximately 13 bullets from the AK-47 rifle he had received, as described above, and willfully caused the death of Tsibouktsakis Germanus, a Greek Orthodox monk (hereinafter: "the Murder of the Monk").

Some time afterwards, Ismail received additional weapons from Muhaned Abu Halawa and planned to use them to carry out a shooting attack at the Hebrew University on Mount Scopus in Jerusalem.

Shortly after the murder of the monk, Muhaned Abu Halawa and additional persons subordinate to the Defendant reported to him that this Act of Terror was carried out by Ismail, whom the Defendant had referred to Muhaned Abu Halawa as detailed above.

The Defendant was involved in the training of terrorists by funding and organizing training facilities for activists who were longstanding members of the terrorist organizations and also activists recruited at the time, all for the purpose of carrying out Acts of Terror.

The terrorist activists who participated in the above-mentioned frameworks underwent training in the operation of various types of weapons, physical training, etc.

*Inter alia*, the Defendant raised a sum of $20,000 from Yasser Arafat which he transferred to Nasser Abu Hamid, one of the commanders in the field, for purposes of funding training facilities for the aforementioned activists. The Defendant took part in this activity, he assisted the terror activists who were recruited and who participated in the training, and he interviewed some of them on various occasions.

The Defendant was active in obtaining arms and other weapons, including assault rifles, explosive belts, a mortar, hand grenades and so forth, for the purposes of carrying out Acts of Terror.

The Defendant appointed Ahmed Barghouti as one of the key individuals responsible for the acquisition of weapons, and was even assisted by the field commanders in the performance of these tasks.

*Inter alia* the Defendant financed the acquisition of weapons supplied by Ahmed to Ziad Hamuda, an activist who was involved among other things in the murder (lynch) of two IDF soldiers at the Ramallah police station. Ziad Hamuda, together with other activists, carried out several shooting attacks aimed at the settlement of Psagot, using these weapons.

In addition, the Defendant financed the acquisition of a mortar for Nasser Abu Hamid. A test firing of this mortar failed.

The Defendant coordinated extensive activity directed at financing the acquisition of weapons from various sources. In this capacity, field commanders and terror activists would submit oral and written requests to him to finance these acquisitions. The Defendant acted to obtain funding by referring the aforesaid requests, along with this recommendation, to Yasser Arafat and other parties.

Also, in some cases the Defendant took care to fund the acquisition of weapons detailed in requests submitted to him by his own sources. As a function of this activity

of the Defendant, the field commanders and terror activists received funding for the purposes of acquiring weapons. These funds were used to carry out Acts of Terror.

One of the events that illustrates this activity is the application that Jihad Ja'ara, one of the activists, submitted to the Defendant requesting funding of activity aimed at carrying out an attack.

The Defendant referred Ja'ara to Ahmed, who reported to the Defendant that Ja'ara intended to carry out an attack in Jerusalem. The Defendant approved the execution of the attack, but requested that it not take place inside Israel.

On the morning of March 26, 2002, activists who had conspired with Ja'ara set out to execute an attack near the Malha shopping mall in Jerusalem. The goal was to willfully cause the deaths of many Israelis.

The attack was not carried out because the terrorists who set out to do so were arrested by IDF soldiers at one of the checkpoints on the road to Jerusalem. One of the terrorists was shot.

The Defendant controlled field commands and terror activists, inter alia, through funding the various needs of these parties, including means of subsistence and economic support.

In this capacity the Defendant outlined an activity during which most of the requests for financial aid, both written and verbal, from field commanders and terror activists were referred to him. The Defendant examined the requests and gave priority to those requests for assistance for activists who had carried out Acts of Terror against Israel, including those who had been declared wanted or were injured while carrying out these attacks. In some cases the Defendant instructed the financial people who worked with him, among them Ali Barghouti, as to which requests were to be approved and also the amounts to be paid.

In other cases, the Defendant transferred the aforementioned requests, along with his recommendations, to Yasser Arafat. Arafat decided whether to approve the requests and the amounts to be paid.

In addition, the Defendant handled requests for the promotion of activists in the hierarchy of the terrorist organizations, and requests for placement of activists in senior positions in administrations funded by Yasser Arafat.

By giving economic support to activists and promoting them in accordance with the priorities specified above, the Defendant incited, encouraged and enabled activists to devote themselves exclusively to carrying out terror attacks, freeing them from the need to support their families, and thus causing an increase in terror activity against Israel.

The Defendant led to an increase in the motivation and willingness of activists in terrorist organizations to carry out Acts of Terror against Israelis, by inciting and encouraging them in incendiary speeches against the State of Israel through the various media and gatherings, and also by distribution of incendiary leaflets.

In these speeches and leaflets the Defendant called for revenge attacks against Israel, and glorified and praised all those who had been involved in carrying out terror attacks against Israeli targets, while giving "saintly status" to those activists injured during these actions.

In response to the efforts of Israel's security forces to contain terror activity, the Defendant announced that the activists of the terrorist organizations, whom he called "heroes," "would succeed in breaching Israelis cities and landing blow after blow" in order to disrupt the sense of security of the inhabitants of the State of Israel.

The Defendant led mass processions which were attended by activists from the organizations, some of them armed. During these processions the participants would engage in violent clashes with IDF soldiers and disturb the peace with the aim of agitating, inciting and encouraging additional activists to join terrorist organizations.

By means of the above activities, the Defendant caused an increase in the willingness of many people to join the terrorist organizations and succeeded in encouraging and inciting field commanders and activists to perform Acts of Terror, including acts of murderous revenge against Israeli targets.

One of the events that is characteristic of this activity took place in the house of

mourning opened by the Defendant after the death of Ra'ad Karmi, who had been a senior leader in the field, on January 14, 2002.

During a gathering of field commanders and terror activists in this house of mourning, on the date mentioned above, the Defendant called on Ahmed Barghouti and others present to carry out a revenge attack for the death of Ra'ad Karmi.

Shortly thereafter Ahmed took steps to fulfill the Defendant's directive, and supplied arms to Muhammed Musalah (Abu Satha), one of the field commanders, who conspired with Ahmed and other activists who were part of the terrorist cell that he commanded for the purpose of carrying out a revenge attack in accordance with the Defendant's directive.

On January 15, 2001 Mohammed Musalah and members of the cell who were with him lay in ambush for cars traveling on Road 443 near the Givat Zeev gas station. At 19:45 Mohammed Matlah and fellow members of the cell approached the vehicle of the late Yoela Chen which was stopped near the gas station and engaged her in conversation in order to establish that she was Israeli.

Immediately afterward Mohammed Matlah and fellow members of the cell fired a round of bullets towards Yoela Chen and Rochelle Eini who was with her in the vehicle, willfully causing the death of the late Yoela Chen and unlawfully seeking to kill Rochelle Eini, who was injured.

Immediately after the attack Ahmed reported to the Defendant that the murder that had been carried out as a revenge attack, in accordance with the Defendant's request.

The Defendant, who was the head of terrorist organizations in the Judea and Samaria region, and in the acts described above led, operated, assisted, incited and participated in Acts of Terror carried out by field commanders and terror activists who were subordinate to them, and thus willfully caused the deaths of hundreds of Israelis, throughout the Relevant Period for the Indictment.

The Defendant, who was the head of terrorist organizations in the Judea and Samaria region, and in the acts described above led, operated, assisted, incited and participated in Acts of Terror carried out by field commanders and terror activists who were subordinate to them, and thus unlawfully and willfully attempted to cause the deaths of hundreds of Israelis.

On the commencement of the hearing in the State's petition to detain the Defendant pending conclusion of the legal proceedings against him, the Defendant disputed the authority of the Court in Israel to try him. Accordingly, this argument is to be heard as a preliminary argument prior to hearing the substance of the petition.

As stated in the indictment, the Defendant is charged with crimes of murder, accessory to murder, incitement to murder, attempted murder, conspiracy to commit a crime, activity in a terrorist organization and membership of a terrorist organization. These charges relate to thirty seven acts of terror against Israelis that the Defendant led, activated, assisted, incited and in which he participated, thus willfully causing the death of hundreds of Israelis.

For the purpose of the hearing, the indictment is to be seen as reflecting the circumstances in light of which the jurisdictional authority of the Court is to be examined - without, at this stage, examining the evidence and whether this is sufficient to corroborate the facts in the indictment.

The detention and prosecution of the Defendant accrue, *inter alia*, from Israel's right to self-defense. This right was recently strengthened in the ruling of the Supreme Court in HCJ 7015/02, in the matter of Ajouri - a ruling given by an extended panel of nine judges. The decision describes the difficult reality in which the State of Israel has found itself since the outbreak of the violent incidents at the end of September 2000, and determines that the forces fighting Israel are terrorists who sow blood and death in cities and settlements. These combatants are not part of a regular army, do not wear uniforms, and hide among a civilian population. The Supreme Court further establishes in this ruling that the struggle of the State of Israel against terror accrues from its right to self-defense, and to this end Israel has undertaken special combative operations with the goal of overcoming the Palestinian terror infrastructure and preventing renewed terror attacks.

Accordingly, the Defendant's remarks concerning the legality of the operations undertaken by the State of Israel in the Judea and Samaria Area are irrelevant for our purpose, and moreover they are outrageous. The State of Israel is committed to protect its citizens, and, on the basis of this commitment, has acted to neutralize the terrorist infrastructures of which the Defendant is one of the heads and leaders.

The Defendant attempts to justify the acts of murder and terror he has committed under the cloak and justification of the rules of international law. However, the rules of international law contain no protocol or convention enabling the murder of civilians by cruel terrorist actions. On the contrary - attacks on civilians constitute a gross violation of the rules of war.

The Defendant raised various arguments before the Court which, he claims, negate the authority of the State of Israel to try him. The following are the details of his arguments, which I shall address in turn.

1. The authority of the State of Israel to try Palestinians who attack Israelis was negated upon the signing of the Oslo Accords.
2. The rules of international law reject Israel's right to try the Defendant, since he is a freedom fighter opposing occupation. All forms of opposition have been defined as legitimate, including the use of violent force. If such a fighter is apprehended, he is to be defined as a prisoner of war and not as a criminal.
3. The Defendant was kidnapped from Ramallah by IDF soldiers contrary to the Oslo Accords and international law.
4. The Defendant holds immunity negating the right of the State of Israel to put him on trial.
5. The indictment is political and constitutes an indictment against the entire Palestinian people.

These arguments were not supported by legal documents negating, even *prima facie,* the Court's authority. The Defendant's complaints are addressed primarily against the actions of the State of Israel toward the Palestinians, and are cloaked in the guise of arguments as to the lack of legal authority.

The Defendant presented two further arguments that do not belong in this preliminary hearing;

1. The indictment does not reveal any tangible offense committed by the Defendant.
2. During the initial stages of the investigation, a meeting between the Defendant and his attorney was delayed, and his sleep was restricted.

In order to answer the question of the authority of an Israeli court, one must first turn to the domestic law of the state. The Israeli Penal Code regulates the jurisdictional authority of the court in criminal matters, establishing that criminal authority extends both to domestic and to foreign offenses.

Article 7(A) of the Penal Code defines a domestic offense as an offense committed entirely or partially within the territory of Israel.

Article 7(B) defines an offense as a foreign offense if any or all of it was supposed to take place within the territory of Israel.

Article 9 establishes that the applicability of Israeli penal law is not restricted by foreign law, including in the case of a foreign offense.

Article 13(B) establishes that the penal laws of the State of Israel shall also apply to foreign offenses committed against the person of any Israeli or Jew as such.

Article 14 lists the restrictions to the applicability of Israeli penal law.

According to the indictment, the Defendant is responsible for actions planned within the areas of the Palestinian Authority, and some of which were actually committed within the territory of the State of Israel. Accordingly, the offenses attributed to him may be classed both as domestic offenses and as foreign offenses.

An analysis of the provisions of the Penal Code clearly shows that the domestic law of the State of Israel grants the Court the substantive authority to hear the criminal proceedings against the Defendant, whether his actions are defined as domestic offenses or as foreign offenses. There is no restriction in the Penal Code on the applicability of these provisions in the case of the Defendant.

The State of Israel has the substantive authority to try the Defendant, both in a proceeding relating to the clarification of the statement of indictment and in the present proceeding in the context of the petition to detain the Defendant pending the completion of the proceedings against him.

The discussion could have been completed here, determining as stated that Israeli domestic law grants the authority. However, I shall below examine whether the Defendant's arguments are supported in domestic or international legal documents, and if so, whether they might raise any restriction rejecting the authority that arises from the domestic law of the State of Israel and prevent the Court from hearing the Defendant's case.

**The Oslo Accords**

The Defendant's first argument is that the Oslo Accords negated the authority of the State of Israel to try Palestinians who attack Israelis. His principal argument concerns the "Interim Israeli-Palestinian Accord Concerning the West Bank and Gaza Strip dated September 18, 1995" (hereinafter **"the Interim Accord"**), which, he claims, nullified the Court's authority to try him.

It must firstly be noted that the Defendant ignores the fact that since the signing of the accords, and to this day, the undertakings accepted by the Palestinian Authority have been violated in an ongoing, systematic and gross manner.

In the Interim Accord, the Palestinian Authority undertook to act against acts of terror in all manifestations and forms. In practice, however, those responsible for the daily murderous terror attacks are those elements who signed the accords on behalf of the Palestinian Authority.

The undertaking to act against terror is one of the declared purposes of the accords, and the central and fundamental foundation thereof. The preamble to the Interim Accord includes a mutual undertaking to act efficiently and effectively against terror acts or threats, violence and incitement. To this end, it is established that steps are to be taken to prevent acts of terror, and legal steps are to be taken against offenders.

The Interim Accord imposes an obligation on the Palestinian Council and on the Palestinian police to fight terror and those who operate it, and to prevent terror attacks as part of an undertaking to engage in a decisive and systemic struggle against all manifestations of terror.

Nevertheless, the State of Israel reserved exclusive responsibility and authority for the security of Israelis in all places. The Interim Accord anchors Israel's right to act and take all steps necessary in any place and in any area, if this is vital in order to prevent acts of terror and to realize its responsibility to ensure the security of Israel and Israelis.

Article 10 in Section 2 of the Interim Accords stipulates:

**"4. Israel shall continue to bear responsibility for external security, as well as responsibility for the overall security of Israelis in order to ensure their domestic security and public order."**

Article 12 of the same section stipulates:

**"Israel shall bear responsibility for the overall security of Israelis and Israeli settlements, in order to ensure their domestic security and public order, and shall maintain all powers to take the steps necessary to meet this responsibility."**

Article 13 adds and stipulates:

**"2.A. Israel shall hold decisive authority in order to protect Israelis and address the threat of terror."**

From these articles, we learn that the State of Israel never waived its undertaking and responsibility for the security of Israel and of Israelis in the Area. This approach has been one of the most basic values of the State since its establishment.

The State of Israel recognizes the necessity imposed upon it to protect the security of its citizens, and secured control of all matters relating to the responsibility for the security of citizens of the State.

Criminal jurisdiction is also regulated in the legal appendix to the Interim Accord, Appendix IV:

Article 7.A. states that **"Israel holds criminal jurisdictional authority in accordance with its domestic laws for offenses committed in the Area against Israel or an Israeli."**

The legal appendix grants the Palestinian Authority criminal jurisdictional authority for offenses committed by residents of the Area who are not Israelis. However, in all matters concerning criminal offenses committed by residents of the Area against Israel or Israelis, Article 7.A. of the Appendix explicitly states that Israel reserves jurisdictional authority.

When criminal jurisdictional authority was granted to the Palestinian Council, it was not established that this authority is exclusive. Accordingly, the Defendant's arguments that Israel was denied criminal jurisdictional authority pursuant to its being granted to the Palestinian Council are to be rejected.

Article 1.B. of the above-mentioned appendix reinforces this opinion, establishing that even in cases where residents of the Area committed offenses against other residents of the Area or their visitors, the Council shall hold jurisdictional authority **"provided that the offense is not connected to Israel's security interests**."

This clause unequivocally clarifies that when the transfer of jurisdictional authority to the Palestinian side was agreed, it was explicitly stated as to which residents this authority was transferred. Since the authority to try those who attack Israel was explicitly not transferred to the Council, the intention of the parties to the Accord was to leave this jurisdictional authority with Israel.

Accordingly, the security interests of the State of Israel create a distinct and independent arena covered and controlled by Israeli jurisdictional authority.

It emerges from the above that, at least in all matters relating to the security of Israel and Israelis and to addressing terror, Israel has responsibility and jurisdictional authority as explicitly stipulated in the Accords itself and in the legal appendix. This is in addition to Israel's inherent right to self-defense as anchored in international law and in the UN Charter.

It should also be noted that an accord between the State of Israel and another entity cannot negate Israel's right to try a person in accordance with a principal law of the State, and, as noted, the Penal Code grants such authority.

Although we have seen above that the accords grant the State of Israel the authority to try the Respondent, another point should be added. As noted, the Palestinian side has violated the accords in an ongoing, systemic and gross manner. Pursuant to these violations, the relations between the parties to the accords have been disconnected, and they cannot be observed by the letter. The relations are now reflected in terror and murder from the Palestinian side, and in attempts to prevent these by the Israeli side. In this state of affairs, it is certainly impossible to speak of a joint legal committee to discuss the appropriate forum for the prosecution of the Defendant.

Although the accord may still be valid *de jure*, *de facto* it is not observed due to the events in the field. One cannot on the one hand demand and insist on the literal observance of all the articles of the accord, while on the other hand maintain a routine policy of the daily murder of Israeli civilians.

A party that consistently violates the substantive articles of an accord cannot demand that the other party observe the technical clauses of that same accord. While one hand repeatedly strikes with a knife, the other waves the pages of the accord. Such a demand cannot be accepted by contract law and cannot be tolerated by human logic.

The Palestinian Authority has made a habit of murdering as many Israeli civilians as possible, in any place, at any time and in any manner - civilians, including women, children and men who are not combatants and who are unarmed. While its hands are engaged in murder, the Palestinian Authority continues to demand compliance with the accords.

The applicability of the accords should be examined, since international accords as such do not form part of Israeli law unless they have been adopted or integrated in Israeli legislation. In HCJ 2717/96, in the case of Wafa Ali, it was established that **"the Interim Accord does not, per se, constitute part of the law applying in Israel or part of the law in Judea and Samaria. In order to be validated as part of the law applying in Israel, a law of the Knesset is required**."

Indeed, an Implementation of the Interim Accord Regarding the West Bank and Gaza Strip Law (Jurisdictional Authorities and Other Provisions) (Legislative Amendments),

5756-1996 was enacted, and was integrated in the Extension of the Emergency Regulations Law (Judea and Samaria and Gaza Strip - Jurisdiction in Offenses and Legal Aid), 5738-1977 (hereinafter: "**the Law**").

The Defendant argues that Article 2(C) of the Law nullified the authority of the courts in Israel to hear the case of a Palestinian if, at the time the offense was committed, he was a resident of the areas of the Palestinian Council and was not an Israeli.

The text of Article 2(A) states: "**In addition to the content of any law, the court in Israel shall be authorized to judge, in accordance with the law applying in Israel, a person present in Israel for his action or failing that occurred in the Area, as well as an Israeli for his action or failing that occurred in the areas of the Palestinian Council, all if the action or failing would have been offenses had they occurred within the area of jurisdiction of the State of Israel**."

The text of Article 2(C) states: "**This Regulation does not apply to a person who, at the time of the action or failing, was a resident of the Area or a resident of the areas of the Palestinian Council who are not Israelis**."

The Supreme Court, in its request for appeal 75/91 in the case of Ala, rejected this argument, establishing that:

"**The intention and purpose of the Regulation are to impose the jurisdictional authority of the courts in Israel on Israelis who live in the Area, even if the offense was committed in the Area, and even if this authority is not granted on the basis of the provisions of Article 7(A) of the Penal Code. The provisions of Regulation 2(A) do not apply to those mentioned in Regulation 2(C). However, Regulation 2(A), which was *ab initio* intended to apply to Israelis, does not aim to change the general provision of Article 7(A) of the Penal Code, which, when its conditions are met, grants authority to the court in Israel to judge a person who committed offenses outside Israel - whether or not he is Israeli. Regulation 2 does not replace or amend or restrict the jurisdictional authority granted in Article 7(A) of the Penal Code.**"

MC (Jerusalem) 561/90 is quoted there, stating: "**Regulation 2 and Article 7 of the Penal Code differ from each other in their purpose, substance and applicability. The purpose of Article 7 is to protect an Israeli outside Israel from injury. The purpose of Regulation 2 is to try an Israeli for an offense committed in the Area in accordance with the laws of the State of Israel and in accordance with the norms current in Israel**."

Although the Supreme Court ruling was made prior to the signing of the accords, Article 2(C) was not changed during the amendment of the Law in 5756, following the signing of the Interim Accord, and, accordingly, the rulings in the verdict and the legal rationale are still valid. Accordingly it emerges that the legislator did not seek to change the legal situation applying in this matter prior to the signing of the Interim Accord. Accordingly, the argument that the courts in Israel do not have jurisdictional authority over the residents of the Area is to be rejected.

Article 6A(A) of the Law states "**A resident of the Area who is not an Israeli who is tried in a court in Israel**" - accordingly, a resident of the Area who is not an Israeli may be tried in an Israeli court.

Article 2(C) of the Law does not aim to change the general provisions of the Penal Code granting authority to the court in Israel to try a person who committed offense outside the State, including in the Area, whether he is a resident or a foreign citizen, including a resident of the Area.

The Interim Accord was validated on the basis of the 1995 Proclamation regarding the Implementation of the Interim Accord, which established which authorities were to be transferred to the Palestinian Council. Article 6A of the proclamation clearly shows that Israel reserved the responsibility, jurisdiction and administration over Israelis, their security, and over the settlements and military sites.

In light of the above, the offenses attributed to the Respondent fall within the framework of domestic or foreign offenses as defined in Section C of the Penal Code.


**International Law**

The Defendant claims that he is to be considered a prisoner of war, and, accordingly, the Occupying Power is forbidden to prosecute him under criminal law.

The Defendant is not to be considered a prisoner of war.

Terrorists who attack a civilian population do not fall within the framework of "lawful combatants" entitled to the status of "prisoners of war," since they do not meet the conditions, in accordance with international law, that a lawful combatant is required to meet. The heads of the Palestinian terror organizations, of whom the Defendant is one, systematically violate the rules of war.

International law distinguishes between two groups of combatants who undertake hostile actions against the State of Israel.

The first group of elements that undertake hostile actions against the State comprises persons who are part of regular armies that engage in combative actions against the State of Israel in accordance with the rules of war.

Combatants who act within the framework of this group and are apprehended receive the status of prisoners of war. Prisoners of war are not prosecuted in accordance with criminal law for their participation in combative actions, provided that they acted in accordance with the rules of war. If, however, they acted contrary to the rules of war, they may be prosecuted on account of war crimes.

In order for a combatant to be recognized as prisoner of war, he must meet four cumulative conditions as established in the Third Geneva Convention of 1949 (Article 4(2):

- The first condition is the presence of a commander responsible for his subordinates.
- The second condition is the presence of a fixed distinguishing sign that may be identified from a distance.
- The third condition is that combatants must carry their weapons openly.
- The fourth condition is that the actions undertaken must be in accordance with the rules and customs of law.

Regarding the Defendant, three of the four conditions are not met.

The field staff, commanders and perpetrators of actions did not bear a fixed distinguishing sign, and accordingly could not be identified from a distance.

The weapon they carried was not overt - on the contrary. The explosives were placed in belts carried by the perpetrators on their bodies, under their clothes, and the weapons were concealed until the moment when they were suddenly revealed at the place of the attack.

The acts of resistance were not managed in accordance with the rules of war, which prohibit injury to civilians; rather, the combat was directed against civilians, including women and children, passengers on buses, shoppers in markets, persons walking in the streets of the city, persons sitting in cafes and eating in restaurants, passengers in cars and pedestrians. None of these are actions that are undertaken by army combatants; these are acts of mass murder against civilians, women, men and children who are not engaged in combat and are not armed, on their way to schools, homes and places of work, while walking, eating or engaging in recreation.

The conditions established in international law in the above-mentioned Geneva Convention must be met cumulatively, and since three of the four conditions were not met, it must be determined that the Defendant is not a legal combatant, and accordingly is not a prisoner of war. Rather, he engaged in acts of murder against persons who are not party to combative actions, causing mass injury to civilians in their places of residence and gathering.

The second group of combatants identified by international law are referred to as "unlawful combatants." This group comprises the members of terrorist organizations and enemy forces that take part in acts of terror and hostility against Israelis and Israel, but who, in apprehension, are not entitled to the status of prisoners of war.

International law distinguishes, by way of a central and fundamental value, between combatants and civilians. One of the most important goals of the rules of war is to ensure that those injured during war shall be solely enemy combatants, while the civilian population shall be afforded protection and shall not be injured.

In order to implement this distinction, great importance is attached to the ability to distinguish between a combatant and a civilian during combat.

In his book, Dinstein notes that **"if combatants can disappear within a civilian public, any civilian within that public will be considered a combatant and will suffer the consequences accruing therefrom."** In his opinion, this is the central reason for the distinction between lawful combatants, who act in accordance with the rules of law, and unlawful combatants, who do not wear uniforms, or do not carry their weapon openly or who attack civilians. In so doing, they blur the distinction between combatant and civilian, and also endanger the population among whom they operate.

Accordingly, international law negates the right of unlawful combatants to enjoy the status of prisoners of war.

Regarding these combatants, Dinstein notes: **"These unlawful combatants may be prosecuted and punished with the full severity of the law The protection of the rules of law is denied to them, and accordingly they are subject to the usual criminal sanctions in national law The unlawful combatant is prosecuted on account of a usual offense before the national court."**

This distinction by international law between lawful and unlawful combatants is based on a very large number of documents, and in addition is anchored in international practice and employed by other armies around the world, such as the US army and the German army.

As stated above, the Defendant is an unlawful combatant and may be prosecuted under criminal law for deliberate injury to innocent civilians.

Moreover, even if we assume that the Defendant is a (lawful) combatant - and it is evident that he is not - the deliberate injury of innocent civilians is considered a violation of the rules of war in accordance with international law, and he may be prosecuted under criminal law for war crimes. The jurisdictional authority in such a case is granted to the state in whose territory the offense is committed.

In his book. Dinstein further notes that in the case of an unlawful combatant who is also a war criminal, the apprehending power has the choice of prosecuting him for a normal criminal offense - murder, in the case of the Defendant - or for an offense relating to the violation of the rules of law, such as injury to civilians.

The Defendant attempts to seize on the Geneva Convention in order to argue that the State of Israel does not have the authority to try him as an unlawful combatant for the offenses of murder. However, consistent regard for the Geneva Convention reveals that a combatant is forbidden to attack civilian targets and civilians. Moreover, Article 48 of the Complementary Protocol of the Geneva Convention from 1949 states that constant caution must be undertaken when managing military operations in order to avoid injury to civilians.

The Defendant's actions, as well as the actions of the field commanders subordinate to him, and those actually executing the attacks, were undertaken against a civilian population within the territories of the State of Israel and within the territories of Judea and Samaria. The actions were perpetrated among a civilian population, which was used as a hiding place and as cover for planning, organizing and executing the acts of terror and killing.

The central objective of the actions of the Defendant and his subordinates is to injure and murder innocent Israeli citizens who are present in an area in which no combat is taking place. These are civilians who were pursuing an ordinary way of life, like any other person, in an area populated by an innocent civilian population that does not constitute a part of the array of combatants.

This policy of terror, the goal of which was to injure as many civilians as possible, is utterly prohibited under international law. The rules of law note the obligation to exercise maximum caution in order to prevent injury to civilians.

The Defendant's method of combat is, in the clearest possible manner, contrary to the most basic rules of law, and accordingly he is not entitled to enjoy the protections afforded under international law to combatants who act in accordance with the rules of war.

We have seen that there is no impediment in terms of the rules of law to the prosecution of the Defendant in accordance with criminal law in the State of Israel.

**The Detention of the Defendant**

The Defendant complains that he was brought to Israel by way of kidnapping from his

place of residence in Ramallah, and accordingly all the legal actions instigated against him are unlawful.

International law, which applies in the case of an "armed conflict" between two parties, permits the injury, and all the more so the detention, of a person who constitutes or is liable to constitute a threat to combative forces in the arena of combat. The laws applying thereto are termed the rules of war.

The purpose of these rules is to restrict the authority granted to the combat forces in using force, in order to minimize the harsh consequences of war.

The rules of war recognize the right of the State of Israel to take various measures in order to protect its security interests, including the detention of those who constitute a security threat to its forces and to its civilian population.

The goal of combat is to weaken the enemy forces in order to subdue them. Accordingly, any act intended to secure this goal, and which it not prohibited by international law, is permitted.

This principle, of protecting civilians and detaining those who attack them, was expressed as early as the St. Petersburg Declaration of 1868. The Hague Convention Regulations of 1907 regarding the rules of war on land do not prohibit the detention of persons suspected of combat actions from the other side.

The Defendant constitutes a security threat to the military forces of the State of Israel, and still more so to its civilian population. Accordingly, the State has the authority, at the least, to detain him in order to protect its civilians by weakening the enemy forces through subduing their leaders.

The Defendant did not attack solely combat forces, but also - and primarily - a civilian population, and accordingly he may clearly be detained in accordance with the rules of law of international law, which recognize the authority of the military commander to detain persons who endanger or are liable to endanger the security of the area, public security or the security of the combat forces.

As stated above, the Defendant belongs to the group of "unlawful combatants," since he attacked a civilian population. This attack constitutes a gross violation of the rules of law, and denies him the right to the status of a prisoner of war. Accordingly, the Third Geneva Convention, which discusses the protection of prisoners of war and prevents their prosecution under criminal law, does not apply in the case of the Defendant, and his entitlement is to the humanitarian conditions to which any defendant subject to criminal prosecution is entitled.

A further argument raised by the Defendant is that the manner in which he was brought to detention, by his transfer from Ramallah to Israel, is contrary to Article 49 of the Fourth Geneva Convention of 1949.

Firstly, it must be noted that a person who violates the most basic provisions of the Convention and deliberates attacks civilians cannot enjoy protection under the same Convention.

As for the substance of the argument: The clause states that **"Individual or mass forcible transfers, as well as deportations of protected persons from occupied territory to the territory of the Occupying Power or to that of any other country, occupied or not, are prohibited, regardless of their motive"**

In HCJ 785/87, in the case of Afu, the Supreme Court ruled that the correct interpretation to be given to this article is that its goal is to prevent the mass deportation of a civilian population from one place to another. This article does not negate the detention of a particular individual who commits acts of hostility, terror and murder.

When the Fourth Geneva Convention was adopted in 1949, after World War II, there was a need to prevent mass and massive deportations of populations from their place of residence for political or ethnic reasons, or for the purpose of forced labor. This phenomenon was common during these years, and it is this which the article aims to prevent.

Accordingly, the article is not relevant in our case, since the purpose of the detention and prosecution is to cease acts of murder and terror committed by the Defendant, and to punish him on account of these actions.

The Supreme Court further establishes in Afu that the Fourth Geneva Convention, including Article 49, is not binding on the State of Israel, since it is not a convention applying rules of international customary law that is automatically adopted in Israel law, but rather a contractual convention that must be adopted by the Israeli government's joining the signatory states of the Convention - which joining Israel has never undertaken.

The decision in the case of Afu constitutes the binding rule in the State of Israel on this matter. This rule was not made in a single or unique case and remained valid solely because the Court has not had an opportunity to amend it - rather, this rule was adopted in several other rulings. See: HCJ 792/88, Matour; HCJ 253/88, Sajadiya.

The Afu rule also remained unchanged in the Ajuri verdict given recently by the Supreme Court. The Defendant's counsel attempt to support their foundations with this verdict, claiming that the Court left the question of the customary or contractual nature of the Fourth Geneva Convention as requiring further discussion, and even assumed, for the purpose of the discussion only, that the Convention applied. Accordingly, they argue, the Fourth Geneva Convention constitutes customary law in the State of Israel.

However, Article 49 of the Convention discusses the mass deportation of populations. Accordingly, even if we accept counsel's argument that the Convention has become customary law - and, as explained above, I do not accept this argument - no assumptions may be drawn from this article in the Defendant's case regarding the Court's authority to judge him in accordance with the laws of the State of Israel.

Moreover, during this period, when terror acts are waxing in Israel in particular, and in the world in general, the nations of the enlightened world, including the USA, are customarily prosecuting unlawful combatants who act against them. The rules of international law recognize this right and reinforce the right of the state to defend itself against those who attack its citizens.

International law thus permits the criminal prosecution of the Defendant for his actions, and he may certainly be detained pending the clarification of his trial for this purpose.

Having seen that the detention was undertaken in accordance with the rules of international law and the international conventions, I shall examine the detention of the Defendant in light of the laws of the State and the rulings of the Supreme Court.

The detention was undertaken in the framework of the Defensive Shield operation, which was intended to subdue the infrastructure of Palestinian terror, whose actions have to date cost the lives of hundreds of civilians and injured thousands, and which operation was undertaken in the framework of Israel's right to self-defense.

The authority of the IDF soldiers to arrest the Defendant is anchored in the laws of the State of Israel in the Security Provisions Order, 5730-1970. Article 78(A) of the Order authorize soldiers to detain the Defendant for his involvement in the murder of hundreds of Israelis in the framework of terror activities, which constitute an offense in accordance with the Order.

The arrest warrant against the Defendant was issued by a police officer on April 15, 2002, on which date the Defendant was detained, in accordance with Article 78(B) of the above-mentioned Order. On April 19, 2002, the detention of the Defendant was extended by a police office in accordance with Article 78(D) of the Order. As required by law, the Defendant was brought before the military court in the Area for the extensions of his detention.

The Supreme Court has addressed issues of detention similar to this case in several cases, and has ruled that the question as to how the Defendant reached the territory of the State of Israel is immaterial.

In CP 3361/61, in the case of Eichman, the Court ruled:

**"The Court shall not investigate the circumstances of the detention and bringing (of the Defendant) to the area of jurisdiction. This rule applies even if the offender's argument is that the act of kidnapping was committed by agents of the State that is prosecuting him, since, in this case, the violated right is not that of the offender, but the sovereign right of the injured state."**

IN the request for appeal 433/95, in the case of Isaf, the Supreme Court ruled that the Court's substantive authority is not influenced by the manner in which the defendant was brought to the area of jurisdiction.

The Supreme Court reiterated this rule in request for appeal 9022/96, in the case of Shith, ruling that:

**"When the courts in Israel have substantive jurisdictional authority regarding a defendant brought before them, the legality of the detention or the trial are not affected by the manner in which the suspect was brought into the territory of Israel."**

These remarks lead us to the conclusion that the manner in which the Defendant was brought within the territory of Israel has no ramifications regarding the legality of his detention.

It must be concluded from the above that the State of Israel acted lawfully in detaining the Defendant in order to prosecute him for his actions. The State's actions are consonant both with the authorities granted to the IDF in accordance with the rules of law in international law and with the laws of the State of Israel.

### Immunity

The Defendant claimed immunity from prosecution pursuant to his status as a member of the Palestinian Parliament. However, his counsel did not present any legal foundation to substantiate their argument.

Immunity is defined as a restriction on the authority of any state vis-à-vis another state, or in favor of an international organization or in favor of individuals, usually diplomats.

International law recognizes two key categories of immunities: the first is diplomatic immunity, on the basis of which a diplomat acting within the framework of his function in a foreign state, is entitled to protection for his actions, in such manner that he cannot be prosecuted for actions committed on the basis of his function in a foreign state.

The second is the immunity granted to heads of state. Immunity is intended to protect a head of state who acted in the name of his state, in order to ensure that he will not be prosecuted for actions committed in the name of the state he heads.

The purpose of the immunity is to ensure protection for those who act on behalf of the state in its relations with another state, and to prevent injury to the sovereignty of one state by another. Immunity is granted only to those who act in the name of the state in its relations with another state.

Immunity may be claimed on the basis of two sources:

1. Immunity on the basis of the custom of international law.
2. Immunity on the basis of a law or agreement.

Though I tried, I have failed to find any rule or custom in international law granting immunity from criminal prosecution to a member of parliament from state A who commits crimes in state B - for the purpose of the discussion, I shall address the argument as if the Defendant were a member of parliament of a state.

To illustrate the point, let us assume that a German member of parliament were to send terrorists to France in order to undertake acts of terror and murder. Would France not have the authority to judge the German offender on the grounds of parliamentary immunity? The answer is that such authority would surely exist.

Membership in a parliament does not grant immunity from prosecution, provided the act constitutes an offense in the state in which it was committed. International law does not recognize this immunity, and does not prevent the prosecution of the offender.

The purpose of immunity is to provide protection in the relations between states, or for a representative who acts vis-à-vis a foreign state. A member of parliament does not represent his state before a foreign state, but rather operates within the internal framework of his own state.

The second possible source is immunity on the grounds of agreements signed between the parties. The sole immunity in the agreements signed between Israel and the Palestinian authority appears in the Oslo B Accords, in which privileges and

immunities are established for delegations of international observers. Accordingly, none of the accords establish immunities for functionaries in the Authority.

The positive mention may be used to deduce the negative. The fact that the subject of immunity was raised in the accords regarding the members of international delegations permits one to assume that the parties to the accords considered the possibility of granting immunity, but chose not to do so with the intention of preventing evasion from Israeli law.

It is apparent from the above that there is no immunity preventing the Defendant's criminal prosecution in the State of Israel, and he is neither covered by diplomatic immunity nor by the immunity granted to the heads of state.

### The Indictment is Political

The Defendant argues that the indictment is political and constitutes an indictment against the entire Palestinian people. This claim must also be rejected. The Defendant is charged with offenses of murder and terror. These offenses relate not to political action, but to criminal action harming innocent persons.

The Defendant is not being prosecuted on account of a political struggle in the framework of legitimate activities, but on account of offenses that have been prohibited as immoral since the earliest days of law and order. Today, these offenses are among the gravest in the criminal code of the State of Israel and of any other democratic and law-abiding state.

It is the obligation of any state, including the State of Israel, to prevent the spilling of civilian blood by the detention, prosecution and punishment of those who act contrary to the manner in which a human being should act.

### Preliminary Arguments

The Defendant's counsel raise two further arguments in the context of the preliminary proceeding regarding the authority of the Court.

The first is that the statement of indictment does not implicate the Defendant in the offenses described therein. The second is that the Defendant was interrogated unlawfully, in that a meeting between the Defendant and his counsel was delayed and his sleep was restricted.

It should be noted that claims of this manner do not belong in a preliminary proceeding discussing the authority of the Court. The proper place for an argument against the statement of indictment is upon completion of the reading of the statement of indictment before the panel in front of which the charges attributed to the Defendant are to be clarified. The claim regarding the manner of interrogation should be raised in a sub-trial that should also take place before the panel hearing the statement of indictment.

Although these arguments do not belong in this proceeding, I shall address their substance. During the hearing before the panel, the Defendant did not refute the statement of indictment; nor did he admit to the offenses attributed to him. He chose not to relate to the statement of indictment, instead raising arguments concerning the Court's lack of authority to judge him.

Since he did not make this argument in the place where it should have been made, viz. before the bench hearing the statement of indictment and the Defendant's involvement therein, then apart from a legal tactic, I can find no reason why he should do so in a proceeding intended entirely to clarify the Court's authority. The Defendant chose to adopt a legal tactic according to which he refuses to accept representation by counsel in hearings before the panel, while in the hearings for the extension of his detention he is represented by three attorneys.

As noted, the proper place for an argument relating to the statement of indictment is before the panel discussing that statement. However, since his attorneys do not appear in the hearings before the panel, the only place where they may raise arguments of this kind is in this proceeding. They have chosen to do so despite the fact that this is not the appropriate proceeding, since they are not appearing in the relevant proceeding to raise such arguments.

At this stage, we are examining the content of the statement of indictment, not the evidence. If the content of the statement of indictment is proved, this will implicate the

Respondent in the offenses attributed thereto; accordingly, the argument that the statement of indictment does not reveal an offense is not to be accepted.

As to the argument regarding the manner of interrogation. As stated, such a claim belongs in a sub-trial, which the Defendant is entitled to pursue within his trial. However, it has no relevance in the current proceeding, which is intended to examine whether the Court is authorized to discuss the question of the Defendant's detention. The Defendant's claim may be examined only after the evidentiary material has been received; at this stage, however, the Court addresses this preliminary argument without its yet having reviewed the evidentiary material.

Without determining on the substance of the argument, I would note that the Supreme Court recently addressed an argument of this kind in HCJ 2901/02, determining that **"it is unthinkable that during and adjacent to acts of combat, persons concerning whom there is suspicion that they are endangering or are liable to endanger the security of the Area, the security of the IDF forces or public security should be permitted to meet with attorneys"**

Accordingly, I reject the argument at this stage of the proceeding regarding the Court's authority in the context of the petition for the detention pending completion of proceedings filed by the State against the Defendant.

Ultimately, the State of Israel has the right and the authority to judge the Defendant, as emerges from Israeli law, from the Oslo Accords and from the rules of international law.

Accordingly, the Court is empowered to discuss the Applicant's petition to detain the Defendant pending the completion of proceedings in his trial, and the petition shall be discussed in substance.

## Issued 7 Tevet 5763 (December 12, 2002), with public notification.

## Zvi Gurfinkel, Judge

**SEE ALSO ...**

- Marwan Bin Khatib Barghouti
- Statement of Indictment: Marwan Barghouti - Aug 14, 2002
- Documents seized during Operation Defensive Shield linking Marwan Barghouti to terrorist activities
- Operation Defensive Shield: Special Update